# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00849-SCT

*JEANETTE HUBBARD*

*AND SHIRLEY JAMES*

*v.*

*STATE OF MISSISSIPPI*


## ON MOTION FOR REHEARING


| | |
|---|---|
| DATE OF JUDGMENT: | 05/03/2000 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | CALHOUN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KEVIN L. HOWE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | JAMES M. HOOD, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/15/2001 |
| MOTION FOR REHEARING FILED: | 06/18/2001 |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied, and this opinion is issued in lieu of our prior per curiam affirmance.

¶2. Tina West, a confidential informant working with the Calhoun County Sheriff's Department, allowed Deputy Bubba Willard to set up video equipment in her home. She called Jeanette Hubbard and Shirley James, asking them to come to her house so that she could purchase some Pethidine from them. When Hubbard and James, who are African-American females, arrived, they sold Tina seven (7) Pethidine pills for $70.00. After they left, Deputy Willard retrieved the video equipment and the pills. Hubbard and James were later convicted for this sale.

¶3. On appeal, they raise three issues: (1) During voir dire, the prosecution struck two African-American females, necessitating a ***Batson*** hearing; (2) West was asked how many times she had bought controlled substances from Hubbard and James during redirect examination. The trial court allowed West to answer this question over objection by the defense; and (3) The verdicts were against the overwhelming weight of

the evidence because the confidential informant's testimony was untrustworthy. These claims are without merit, and the verdicts and sentences are affirmed.

## ANALYSIS

### I. DID THE TRIAL COURT ERR BY FAILING TO CONDUCT A *BATSON* HEARING?

¶4. Hubbard and James claim that, because the State used peremptory strikes to remove the only two African-American females in the jury pool, a hearing under ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), was required. At trial, defense counsel contended that the two strikes constituted a pattern of discrimination. The trial court ruled that no prerequisite showing had been made; therefore no **Batson** hearing was needed. Hubbard and James cite ***Magee v. State***, 720 So. 2d 186 (Miss. 1998), in support of their argument:

> Under **Batson**, a challenge to a peremptory strike requires a three-step process. First, the defendant must establish a prima facie case that race was the criteria for the exercise of the peremptory challenge. To do this, the defendant must show: (1) that he is a member of a "cognizable racial group, " (2) that the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and (3) that facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities. Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. If a racially neutral explanation is offered, the defendant may rebut the explanation. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination.

*Magee*, 720 So. 2d at 188 (citations omitted).

¶5. The State used all of its six peremptory strikes, two against African-American females and four against Caucasian men and women. The final jury consisted of five Caucasian males, two African-American males and five Caucasian females.

¶6. Hubbard and James have failed to show that the State engaged in a pattern of discrimination. Two African-American males sat on the final jury. Furthermore, striking only *two* African-American females does not establish a *pattern*. Indeed, four of the State's strikes were against Caucasians. No statements were made by the State which would indicate that it was purposefully engaging in stacking the jury against Hubbard and James. In fact, one of the African-American females who was struck knew one of the defense witnesses. This claim is without merit.

### II. DID THE TRIAL COURT ERR BY ALLOWING A WITNESS TESTIFY AS TO HUBBARD'S AND JAMES'S PRIOR CRIMINAL ACTS?

¶7. During the defense's cross-examination of CI Tina West, the following discourse occurred:

> BY MR. MOORE: Now Tina, have you ever pawned any jewelry?

> BY MS. WEST: Yes, I have.

> Q. Have you ever pawned any jewelry to any of these two ladies over here?

A. Yes, I have.

Q. I am going to ask you can you identify this bracelet right here?

A. It's mine.

Q. And how did Jeanette come in possession of that?

A. I traded it for pills.

Q. You didn't pawn that to her?

A. [Inaudible answer.]

* * *

Q. Now then Jeanette still had this, did she not? She still. She still had possession of this particular piece of jewelry; did she not?

A. Yes.

¶8. On redirect examination, the following colloquy took place:

BY THE STATE: . . . Now Mr. Moore also asked you about the bracelet and I think he introduced that that [sic] is marked as defendant's exhibit 2 and you said you gave that to who?

BY MS. WEST: Jeanette.

Q. And why did you give it to her?

A. For pills.

Q. And this is like money to get pills?

A. (Affirmative nod).

Q. What type of pills did you get from her when you gave her this bracelet here?

A. Pain pills.

Q. And when was that? Was it before or after this transaction we are here on today?

A. I don't know.

Q. You don't remember. How many different occasions did you get some kind of controlled substance from?

BY MR. MOORE: I object. That is not proper redirect and fact of the matter, I want to approach the bench on that very statement.

[Bench conference ensues.]

\* \* \*

Q. All right, Tina, how many different times did you buy controlled substances, pills -- some type of pain pill --from these two defendants?

A. Several.

Q. All right. And did you always pay in cash or did you some times pay in jewelry?

A. Yes, sometimes.

Q. Was there any other way you paid them?

A. No.

¶9. These colloquies show that the defense "opened the door" to the testimony of prior bad acts, and Hubbard and James cannot now complain that the testimony was prejudicial to them.

### III. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE? WAS THE EVIDENCE SUFFICIENT ENOUGH TO SUPPORT THE VERDICT?

¶10. Hubbard and James contend that "no reasonable jury could have believed" the testimony of CI West after she admitted that she was a drug addict, had lied on several occasions, had been involved in scams to obtain pain pills, and admitted that the jury should not believe her.

¶11. In deciding whether to grant or deny a motion for directed verdict, the trial judge is required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant. *Yates v. State*, 685 So. 2d 715, 718 (Miss. 1996). The testimony of one credible witness can be sufficient to sustain a verdict. *Holmes v. State*, 660 So. 2d 1225, 1227 (Miss. 1995). In determining whether a jury verdict is against the overwhelming weight of the evidence, we must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997).

¶12. In *Clayton v. State*, 582 So. 2d 1019, 1021 (Miss. 1991), we held that, even though the main witness against the defendant was a convicted felon, an admitted drug addict, "a general reprobate," and "unworthy of belief," his "unsavory background was thoroughly explored" during trial and "the jury ha[d] the responsibility of assessing his credibility." Here, West's testimony was supported by the audio and video tapes of the transaction and the crime laboratory report. And even though West testified that the jury should not believe her, she did aver that she was telling the truth about the drug transaction with Hubbard and James. These claims are without merit.

### CONCLUSION

¶13. Because a *Batson* hearing was not required, the defense opened the door to evidence of prior bad acts, and the verdicts were supported by sufficient evidence, the judgment of the Circuit Court of Calhoun County is affirmed.

¶14. **AS TO JEANETTE HUBBARD: THE MOTION FOR REHEARING FILED BY JEANETTE HUBBARD IS DENIED. CONVICTION OF SALE OF A CONTROLLED SUBSTANCE (PETHIDINE) AND SENTENCE OF FIFTEEN YEARS WITH THREE YEARS SUSPENDED, TWELVE YEARS TO SERVE, AND PAYMENT OF A FINE OF $5,000 AND ALL COSTS, AFFIRMED. AS TO SHIRLEY JAMES: CONVICTION OF SALE OF A CONTROLLED SUBSTANCE (PETHIDINE) AND SENTENCE OF FIFTEEN YEARS WITH THREE YEARS SUSPENDED, TWELVE YEARS TO SERVE, AND PAYMENT OF A FINE OF $5,000 AND ALL COSTS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. COBB, J., CONCURS IN RESULT ONLY**.